IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TUCKER AUTO-MATION OF NORTH CAROLINA,    )
LLC,                                     )
                                         )
        Plaintiff/Counter Defendant,     )
                                         )
    v.                                   )
                                         )
RUSSELL RUTLEDGE & RUTLEDGE              )        1:15-cv-893
COMMERCIAL, LLC,                         )
                                         )
        Defendants/Counterclaimants,     )
                                         )
    v.                                   )
                                         )
PATRICK MERCIER & TUCKER                 )
AUTO-MATION HOLDINGS, USA, LLC           )
                                         )
        Counterclaim Defendants.         )


**MEMORANDUM OPINION AND ORDER**

Loretta C. Biggs, District Judge.

Plaintiff, Tucker-Automation of North Carolina, LLC, ("Tucker") initiated this diversity action on October 21, 2015 against Defendants, Russell Rutledge and Rutledge Commercial, LLC, alleging claims arising under state law. This matter is before the Court on Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 32.) For the reasons stated below, Defendants' motion is granted in part and denied in part.

Tucker, in its Amended Complaint ("Complaint"), alleges that it manufactures and distributes, among other things, revolving

automatic doors for commercial use. (ECF No. 31 ¶ 10.) Defendant Russell Rutledge ("Rutledge") served as Tucker's president from June 2013 to his resignation in September 2015. (*Id.* ¶ 10.) Eight days following his resignation, Tucker alleges that Rutledge filed paperwork with the North Carolina Secretary of State to form Rutledge Commercial, LLC. (*Id.* ¶ 32.) According to the Complaint, Rutledge Commercial, LLC is "in the business of providing automatic door solutions to commercial business enterprises." (*Id.* ¶ 62.) On October 21, 2015, Tucker filed this action, alleging the following claims against Defendants: (Count 1) intentional interference with actual and prospective contractual relations; (Count 2) misappropriation of trade secrets in violation of N.C. Gen. Stat. § 66-152; (Count 3) defamation; (Count 4) unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1; (Count 5) conversion; and (Count 6)[1] violation of North Carolina's Property Protection Act, N.C. Gen. Stat. § 99A-2. (*Id.* at 11-16.)

Defendants move to dismiss Counts 1, 2, 4, and 6 for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 32.)

---

[1] The Complaint has two separate claims, which Tucker identifies as Count 5—its claim of conversion and claim under N.C. Gen. Stat. § 99A-2. For purposes of this discussion, the Court will identify the claim under N.C. Gen. Stat. § 99A-2 as Count 6.

## I.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) "challenges the legal sufficiency of a complaint," including whether it meets the pleading standard of Rule 8(a)(2).  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  When evaluating the complaint, the court views the facts in the light most favorable to the plaintiff.  *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014).

Further, where, as in this case, subject matter jurisdiction is based on diversity of citizenship, the court must apply the substantive law of the forum state.  *See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  In doing so, the court has an obligation to apply the law as determined by the state's highest court, *i.e.*, the North

Carolina Supreme Court. *See id.* When the state's highest court has not addressed directly or indirectly the issue before the federal court, the state's appellate courts' decisions, though not binding, constitute the best indicia of what the state law is unless the court is convinced by other persuasive data that the state's highest court would rule otherwise. *Id.* The court must apply state laws as they currently exist and cannot expand them. *Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993).

## II. DISCUSSION

### A. (Count 1) Intentional Interference with Actual and Prospective Contractual Relations[2]

The Court first considers Defendants' motion to dismiss Tucker's claim of tortious interference with contract and

---

[2] North Carolina courts have used varying terminology in identifying tortious interference claims, referring to tortious interference with relations, business relations, and contract interchangeably at times. *See Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, No. 00-CVS-10358, 2002 WL 31002955, at *10 (N.C. Super. Ct. July 10, 2002); *see Superior Performers, Inc. v. Phelps*, 154 F. Supp. 3d 237, 248 (M.D.N.C. 2016). This Court explained that "claims for tortious interference with business relations and prospective business relations are understood to be claims for tortious interference with contract and prospective contract." *Phelps*, 154 F. Supp. 3d at 248. In a recent decision, the North Carolina Supreme Court referred to the claims as tortious interference with contract and tortious interference with prospective economic advantage. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 462–63 (N.C. 2016). The Court will reference the claims consistent with the North Carolina Supreme Court's decision in *Beverage Systems*.

prospective economic advantage.[3]  Though raised as a single claim, the Court notes that Count 1 actually includes two separate claims—one for tortious interference with contract and one for tortious interference with prospective economic advantage.  *See Superior Performers, Inc. v. Phelps*, 154 F. Supp. 3d 237, 248 (M.D.N.C. 2016).  Defendants argue both claims should be dismissed because the Complaint fails, among other things, to "specifically identify any contracts that have been breached or any particular contract that any customer has been induced to refrain from entering into with Tucker."  (ECF No. 33 at 18.)  The Court agrees.

To state a claim of tortious inference with contract, a plaintiff must allege: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Beverage Sys. of the Carolinas*, 784 S.E.2d at 462 (quoting *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988)).  "A tortious interference with prospective economic advantage claim

---

[3] Though the Defendants, in their briefing, address Tucker's sixth claim under N.C. Gen. Stat. § 99A-2 claim first, the Court will address the claims as they appear in the Complaint, beginning with Tucker's tortious interference claims.

has the same elements except that instead of an existing contract, there must be a contract that would have been entered into but for the defendant's conduct." *BioSignia, Inc. v. Life Line Screening of Am., Ltd.*, No. 1:12CV1129, 2014 WL 2968139, at *7 (M.D.N.C. July 1, 2014) (citing *Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002)).

In its Complaint, Tucker alleges that in the automated door industry "it is not customary for customers to sign written contracts for a specified term with their manufacturer and/or supplier." (ECF No. 31 ¶ 46.) Rather, according to Tucker, it is common practice for an automated door company to provide technical and administrative service on a going-forward basis as needed, once a product is installed. (*Id.* ¶¶ 46–47.) Tucker alleges that, before Rutledge's resignation, its customers included Asheville-Buncombe Technical Community College, UNC Heart and Vascular at Meadowmont, Moses H. Cone Memorial Park, Duke University Hospital, and Sampson Regional Medical Center. (*See id.* ¶ 45.) These clients, Tucker alleges, provided over $500,000 in business in the last two years, but after Rutledge's resignation, they elected to retain Rutledge Commercial, LLC to fulfill their needs on a going-forward basis. (*Id.* ¶¶ 45, 48.) According to the Complaint, it was Defendants' actions that induced these customers to transition their business from Tucker to Defendants. (*See id.* ¶¶ 44, 48.)

6

While these allegations, viewed in the light most favorable
to Tucker, demonstrate an ongoing business relationship between
Tucker and its former customers, an ongoing business relationship,
without any contractual obligations between the parties, is
insufficient to state a claim of tortious interference with
contract under North Carolina law. *See Phelps*, 154 F. Supp. 3d at
249, 250 (dismissing the plaintiff's tortious interference with
contract claim because the plaintiff failed to sufficiently allege
a valid contract between itself and a third party, but rather
"refers to its 'relationships' with its customers, which is
insufficient under North Carolina law"); *Beverage Sys. of the
Carolinas*, 784 S.E.2d at 462–63 (dismissing the tortious
interference with contract claim, holding that although it was the
"industry custom . . . for owners of beverage-dispensing
equipment" to engage repair companies "on an as-needed basis only,"
rather than via contract, the plaintiff had failed to establish a
legal obligation between it and the customers it acquired); *Sports
Quest, Inc. v. Dale Earnhardt, Inc.*, Nos. 02 CVS 0140, 01 CVS 2200,
2004 WL 742918, at *6 (N.C. Super. Ct. Mar. 12, 2004) (explaining
that the "fatal flaw[]" in the plaintiff's tortious interference
claim is that "not all of [the plaintiff's] relationships with
third parties included contracts" and thus plaintiff cannot
maintain its tortious interference claim with respect to the

"existing business relations" in the absence of a "contractual obligation to [the plaintiff]"). Nor are Tucker's allegations sufficient to allege a claim of tortious interference with prospective economic advantage under North Carolina law, because Tucker has failed to sufficiently allege that a contract would have resulted with a third party but for Defendants' tortious interference. *See Phelps*, 154 F. Supp. 3d at 249–50; *Beverage Sys. of the Carolinas*, 784 S.E.2d at 463. At best, Tucker's allegations reveal an expectation that its customers would continue to do business with it. However, a mere expectation customers "would continue to do business with [a] plaintiff" is "insufficient to support a claim for either tortious interference with contract or tortious interference with prospective economic advantage." *Beverage Sys. of the Carolinas*, 784 S.E.2d at 463.

Because Tucker has failed to specifically identify a contract that confers a contractual right between Tucker and any third party or any specific contract Defendants induced a third party to refrain from entering into with Tucker,[4] the Complaint fails to state a claim of tortious interference with contract or tortious

_____

[4] Defendants only made arguments on the first and fourth elements. (*See* ECF No. 33 at 18–19.) In light of the Court's ruling that Tucker has failed to sufficiently allege the first element, it is unnecessary for the Court to evaluate Defendants' arguments related to the fourth element.

interference with prospective economic advantage. Thus, Defendants' motion to dismiss these claims must be granted.

## B. (Count 2) Misappropriation of Trade Secrets

Count 2 of Tucker's Complaint alleges that Defendants misappropriated various trade secrets in violation of the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. § 66-152. (ECF No. 31 ¶¶ 77-88.) Defendants seek dismissal, contending, among other things, that Tucker: (1) has not identified any alleged trade secrets with the requisite particularity; and (2) has not alleged acts of misappropriation with the requisite particularity. (ECF No. 33 at 9.) The Court disagrees.

Under the TSPA, an "owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. "A trade secret is business or technical information that '[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development . . . and [is] the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 620 S.E.2d 222, 226 (N.C. Ct. App. 2005) (alterations in original) (quoting N.C. Gen. Stat. § 66-152(3)(a)–(b)). Courts consider the following factors in determining whether an item constitutes a trade secret:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Id.* (quoting *State ex rel. Utils. Comm'n v. MCI Telecomms. Corp.*, 514 S.E.2d 276, 282 (N.C. Ct. App. 1999)). "Misappropriation," under the TSPA, is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1).

To state a claim for misappropriation of trade secrets, the complaint "must identify [the] trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Washburn v. Yadkin Valley Bank & Tr. Co.*, 660 S.E.2d 577, 585 (N.C. Ct. App. 2008) (quoting *VisionAIR, Inc. v. James*, 606 S.E.2d 359, 364 (N.C. Ct. App. 2004)). "The complaint must also set forth with sufficient specificity the acts by which the alleged misappropriation occurred." *Bldg. Ctr., Inc. v. Carter Lumber,*

*Inc.*, No. 16 CVS 4186, 2016 WL 6142993, at \*3 (N.C. Super. Ct. Oct. 21, 2016). "[A] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated," is insufficient under North Carolina law to state a claim for misappropriation of trade secrets. *Washburn*, 660 S.E.2d at 585–86.

Tucker's Complaint identifies the following trade secrets allegedly misappropriated by Defendants:

> (a) financial information, including pricing methods and profit/loss statistics;
> (b) business strategy, growth plans, and business development initiatives;
> (c) customer lists, which include customer names, identity of key personnel, telephone numbers, street addresses, and email addresses;
> (d) customer information, including customer preferences as to product types and specifications, pricing, and retention strategies;
> (e) contract terms;
> (f) historic sales data;
> (g) pricing arrangements, including margins;
> (h) products and product developments; and
> (i) capital investments[.]

(ECF No. 31 ¶ 22.) Tucker's Complaint also identifies "specific data" that allegedly "compromises [sic] a significant portion of the Confidential Information and Trade Secrets" that are at issue here:

> (a) the prices charged by Tucker to its customers for automatic door products and services on specific types of projects;

11

> (b) discounts, if any, provided by Tucker to its customers for products sold and services rendered;
>
> (c) the costs incurred by Tucker with respect to its provision of products and services, and the profit margin related to the same; and
>
> (d) other relevant items that may be useful to maintaining the customer relationship, such as the frequency at which a customer may order new products, or request service on existing items.

(*Id.* ¶ 24.)

The foregoing allegations in paragraphs 22 and 24 of the Complaint, taken as true and drawing all reasonable inferences in favor of Tucker, adequately identify the trade secrets Defendants allegedly misappropriated. North Carolina courts have held that similar types of information can constitute trade secrets. *See Ge Betz, Inc. v. Conrad*, 752 S.E.2d 634, 649 (N.C. Ct. App. 2013); *Sunbelt Rentals,* 620 S.E.2d at 227–28; *Byrd's Lawn & Landscaping, Inc. v. Smith*, 542 S.E.2d 689, 692 (N.C. Ct. App. 2001); *Bldg. Ctr.*, 2016 WL 6142993, at *3–4; *accord Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) ("Customer pricing lists, cost information, confidential customer lists, and pricing and bidding formulas may constitute trade secrets."). While Defendants may desire a more particularized description of

the alleged trade secrets,[5] at this stage in the litigation, the Court finds that Tucker's allegations are sufficient to place Defendants on notice as to the trade secrets they are accused of misappropriating. *See Bldg. Ctr.*, 2016 WL 6142993, at *4.

The Court also finds that Tucker has sufficiently alleged acts that plausibly demonstrate that Defendants misappropriated the alleged trade secrets. Tucker's Complaint alleges that: (1) Rutledge, at the time of his departure, took with him "a smartphone and a number of hard-copy files containing Confidential Information and Trade Secrets;" and (2) "Rutledge accessed the electronic database containing information respecting Tucker's vendors, contractors, price quotes, costs, and discounts, downloaded or otherwise copied this information, and took it with him for the purpose of using the information to further his own business interests to the detriment of Tucker" (ECF No. 31 ¶¶ 42, 43). *See E-Ntech Indep. Testing Servs., Inc. v. Air Masters, Inc.*,

---

[5] In addition to arguing Tucker has not sufficiently identified alleged trade secrets, Defendants contend that the allegations in the Complaint defeat Tucker's misappropriation claim. (ECF No. 33 at 15.) According to Defendants, Tucker's Complaint alleges that "sales in the automatic door industry are generated through personal relationships, and customers rely on those personal relationships in deciding who to do business with." (*Id.* at 15.) Defendants assert that "personal relationships, experience, and knowledge of an employee are not trade secrets" and thus Tucker's claim of misappropriation must be dismissed. (*Id.* at 16.) However, as stated above, Tucker's Complaint sufficiently identifies information that could constitute trade secrets under North Carolina law to survive dismissal.

No. 16 CVS 3092, 2017 WL 73449, at *5 (N.C. Super. Ct. Jan. 5, 2017) (holding that allegations that information was copied or recorded from plaintiff's computer system and hard files, and such information was obtained from one of three employees with access to the information, was sufficient at the Rule 12(b)(6) stage). The Complaint further alleges that Rutledge took the trade secrets and other confidential information while he was still employed by Tucker and used the information to transition business from Tucker to Rutledge. (*See* ECF No. 31 ¶¶ 35–37, 43–44.) "[W]here a former employee has access to [confidential information] through former employment, moves to another company, and causes the same customers to move their business to the new company," courts have found such allegations of misappropriation sufficient. *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, No. 13 CVS 1037, 2015 WL 1880769, at *15 (N.C. Super. Ct. Apr. 23, 2015) (citing *Byrd's Lawn & Landscaping*, 542 S.E.2d at 693); *see Philips Elecs. N. Am. Corp.*, 631 F. Supp. 2d at 722 ("Courts have found misappropriation where a former employee had access to confidential information or helped a competitor quickly deliver the new products to market.").

The Court concludes that Tucker has stated a claim of misappropriation of trade secrets. Thus, Defendants' motion to dismiss this claim is denied.

## C. (Count 4) Unfair and Deceptive Trade Practices

Tucker's fourth claim alleges that Defendants' activities in "unlawfully interfer[ing] with Tucker's existing and prospective customer relationships, malign[ing] Tucker's business reputation, solicit[ing] Tucker's employees, misappropriat[ing] Tucker's confidential and proprietary information, and retain[ing] Tucker's personal property" violate the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. (*See* ECF No. 31 ¶¶ 96-97.) Defendants argue that, because Tucker has failed to state claims of tortious interference and misappropriation of trade secrets, the UDTPA claim should be dismissed to the extent it is based on those claims. (ECF No. 33 at 19.)

The UDTPA declares "unfair or deceptive acts or practices" unlawful. N.C. Gen. Stat. § 75-1.1(a). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). To prevail on a UDTPA claim, a plaintiff must demonstrate: "(1) defendant committed an unfair or deceptive act or practice, (2) the act in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Id.*

Tucker's UDTPA claim rests, in part, on its claims for tortious interference with contract and prospective economic advantage and, in part, on the claim of misappropriation of trade

secrets. (*See* ECF No. 31 ¶¶ 96–97.) Because Tucker has failed to state claims of tortious interference with contract and prospective economic advantage, its UDTPA claim must be dismissed to the extent it is based on the tortious interference claims. *See Beverage Sys. of the Carolinas*, 784 S.E.2d at 463 ("Plaintiff's section 75-1.1 claim presupposes success of at least one of plaintiff's contract claims. Because we hold that each of those claims fails, plaintiff's unfair and deceptive practices claim also fails."). On the other hand, because Tucker has stated a claim of misappropriation of trade secrets, the Court denies Defendants' motion to dismiss the UDTPA claim to the extent such claim is based on the claim for misappropriation of trade secrets.[6]

### D. (Count 6) Property Protection Act, N.C. Gen. Stat. § 99A-2[7]

Finally, the Court must examine Defendants' motion to dismiss Tucker's sixth claim, which Tucker asserts only against Rutledge individually, under the Property Protection Act, N.C. Gen. Stat. § 99A-2. The statute states that "[a]ny person who intentionally gains access to the nonpublic areas of another's premises and

---

[6] Tucker also bases its UDTPA claim on allegations of Defendants' commercial disparagement, solicitation, and retention of Tucker's property. (ECF No. 31 ¶ 97; ECF No. 35 at 12.) Defendants have not sought dismissal of Tucker's UDTPA claim based on these allegations. Thus, the UDTPA claim also survives to the extent it is based on these allegations.

[7] *See supra* note 1.

engages in an act that exceeds the person's authority to enter those areas is liable to the owner or operator of the premises for any damages sustained." N.C. Gen. Stat. § 99A-2(a). Rutledge contends that the General Assembly provided N.C. Gen. Stat. § 99A-2 with an effective date of January 1, 2016, making the statute applicable only to acts committed on or after that date. (ECF No. 33 at 5.) Rutledge further argues that, because the alleged acts that form the basis of Tucker's claim under N.C. Gen. Stat. § 99A-2 occurred prior to January 1, 2016, the statute is inapplicable and the claim must be dismissed. (*Id.* at 6.) The Court agrees.

"All statutes are given an effective date by the General Assembly, either in the statute itself or under N.C. Gen. Stat. § 120-20[.]" *Ray v. N.C. Dep't of Transp.*, 727 S.E.2d 675, 682 (N.C. 2012). To determine whether the General Assembly provided an effective date in the statute itself, the court must first examine "the plain language of the statutory provision[] at issue," and, if necessary, consider legislative history and circumstances surrounding the statute's enactment. *State v. Sitoksy*, 767 S.E.2d 623, 625-26 (N.C. Ct. App. 2014). If the statutory language is clear and unambiguous, the court eschews statutory interpretation and must give effect to the statute's plain and definite meaning. *Id.* In the absence of an effective date in the statute, the default rule in N.C. Gen. Stat. § 120-20 provides that "[a]cts of

the General Assembly shall be in force only from and after 60 days after the adjournment of the session in which they shall have passed."  N.C. Gen. Stat. § 120-20.

Here, the session law enacting N.C. Gen. Stat. § 99A-2 plainly states that "[t]his act becomes effective January 1, 2016, and applies to acts committed on or after that date."  2015 N.C. Sess. Laws 2015-50.  This Court is therefore obligated to give effect to this unambiguous stated effective date.  *See Sitoksy*, 767 S.E.2d at 626 (concluding that, because the General Assembly "specifically articulated a clear effective date" in the session law, the court is "obligated to give effect to this unambiguously stated effective date").  It is undisputed that Tucker's claim under N.C. Gen. Stat. § 99A-2 is based on alleged acts by Rutledge that occurred prior to January 1, 2016, as the Complaint alleges that the relevant acts were committed prior to September 14, 2015— the date in which Rutledge ceased employment with Tucker.  (*See generally* ECF No. 31 ¶¶ 31-60.)  Accordingly, N.C. Gen. Stat. § 99A-2 does not provide Tucker with a cause of action based on the allegations in the Complaint.

Tucker advances two arguments in an attempt to avoid dismissal of this claim.  First, Tucker argues that the January 1, 2016 effective date "appeared in the bill introduced in the North Carolina legislature," and "such limitation is omitted in the

enacted statute." (ECF No. 35 at 3.) However, the stated effective date of N.C. Gen. Stat. § 99A-2 was contained in the session law enacting the statute. *See* 2015 N.C. Sess. Laws 2015-50. Where, as in this case, a bill "becomes law, the term 'bill' is no longer used," and the "law is given a chapter number and is published under that number in a volume called '*Session Laws of North Carolina*.'" *See How a Law is Made*, http://www.ncga.state.nc.us/NCGAInfo/Bill-Law/bill-law.html (last visited July 5, 2017) (emphasis added). While Tucker is correct that the codified statute, N.C. Gen. Stat. § 99A-2, does not contain an effective date, the North Carolina Supreme Court has held that a "statement of a legislative enactment contained in the Session laws is controlling over the statement [of it as] codified in the General Statutes." *Custom Molders, Inc. v. Am. Yard Prods., Inc.*, 463 S.E.2d 199, 202 (N.C. 1995); *see also Schofield v. Great Atl. & Pac. Tea Co.*, 264 S.E.2d 56, 62 (N.C. 1980); *Wright v. Fidelity & Cas. Co. of N. Y.*, 155 S.E.2d 100, 107 (N.C. 1967).

Moreover, even if, for the sake of argument, the General Assembly failed to designate a specific effective date for N.C. Gen. Stat. § 99A-2, as Tucker appears to argue, the default effective date supplied by N.C. Gen. Stat. § 120-20 would still require the Court to dismiss Tucker's claim. The 2015 session of the General Assembly was adjourned on September 30, 2015, (ECF No.

33-4), providing N.C. Gen. Stat. § 99A-2 with a default effective date of November 29, 2015, which is more than two months after the date on which Rutledge resigned, on September 14, 2015.

Second, Tucker argues that N.C. Gen. Stat. § 99A-2 is a clarification of existing law and applies to Rutledge's conduct irrespective of the effective date. (*See* ECF No. 35 at 3-4.) Specifically, Tucker argues that "Chapter 99A has always provided statutory civil remedies for interference with private property rights" and that "Section 99A-2 simply supplements and codifies existing law with specific statutory penalties applicable thereto." (*Id.* at 4.)

"In construing a statute with reference to an amendment it is presumed that the legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it." *Childers v. Parker's, Inc.*, 162 S.E.2d 481, 483 (N.C. 1968). "A clarifying amendment, unlike an altering amendment, is one that does not change the substance of the law but instead gives further insight into the way in which the legislature intended the law to apply from its original enactment." *Ray*, 727 S.E.2d at 681. Clarifying amendments function retroactively, applying "to all cases brought after their effective dates" irrespective of when the claim actually arose. *Id.* In contrast, because altering amendments are substantive changes in the law, the effective date

20

provided by the General Assembly controls. *Id.* at 681–82; *Wiggins v. E. Carolina Health-Chowan*, *Inc.*, 760 S.E.2d 323, 326 n.2 (N.C. Ct. App. 2014).

"To determine whether the amendment clarifies the prior law or alters it requires a careful comparison of the original and amended statutes." *Ferrell v. Dep't of Transp.*, 435 S.E.2d 309, 315 (N.C. 1993). "Often the amendment is 'to improve the diction, or to clarify that which was previously doubtful.'" *Id.* (quoting *Childers*, 162 S.E.2d at 484). In such case, the amendment is presumed to be clarifying rather than altering. *Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 328 S.E.2d 274, 280 (N.C. 1985). An amendment is also more likely to be clarifying where "the statute initially 'fails expressly to address a particular point' but addresses it after the amendment." *Ray*, 727 S.E.2d at 682 (quoting *Ferrell*, 435 S.E.2d at 315). Where, however, the legislature alters an unambiguous statute, it is presumed that the legislature intended to change the law. *Childers*, 162 S.E.2d at 484. It is the court's "job to determine whether an amendment is clarifying or altering," and "[t]he General Assembly's inclusion of an effective date in the session law does not alter this outcome." *Ray*, 727 S.E.2d at 681–82.

Here, Tucker has not provided any North Carolina authority addressing whether N.C. Gen. Stat. § 99A-2 is a clarifying or

altering amendment. As a federal court sitting in diversity jurisdiction, the Court must apply state laws as they currently exist and cannot expand them. *Burris*, 10 F.3d at 247. Nor does this Court have an original statute to which it can compare N.C. Gen. Stat. § 99A-2 because N.C. Gen. Stat. § 99A-2 is a new statute. Specifically, the statute creates a civil cause of action in favor of an employer against an employee who, among other things, engages in certain acts that amount to a breach of the person's duty of loyalty to the employer. *See* N.C. Gen. Stat. § 99A-2(b); *People for the Ethical Treatment of Animals, Inc. v. Stein*, No. 1:16CV25, 2017 WL 1683188, at *1 (M.D.N.C. May 2, 2017) (considering "a pre-enforcement challenge to the North Carolina Property Protection Act, . . . which in relevant part creates a civil cause of action for a North Carolina employer against an employee"), *appeal docketed*, No. 17-1669 (4th Cir. May 26, 2017). The statute also provides, *inter alia*, for exemplary damages in the amount of $5,000 per day for violations. *See* N.C. Gen. Stat. § 99A-2(d)(4). While Tucker claims that the statute codifies existing common laws such as trespass and conversion, (ECF No. 35 at 4), the statute specifically states, "Nothing in this section shall be construed to limit any other remedy available at common law or provided by

the General Statutes."[8]  N.C. Gen. Stat. § 99A-2(g).  Thus, the Court is unpersuaded by Tucker's argument that N.C. Gen. Stat. § 99A-2 is clarifying in nature and thus applies retroactively.

The Court concludes that N.C. Gen. Stat. § 99A-2 applies to acts committed on or after its effective date of January 1, 2016. Because Tucker's claim is based on acts committed prior to this date, Tucker has failed to state a claim under N.C. Gen. Stat. § 99A-2.  Thus, Defendants' motion to dismiss this claim must be granted.

## III. CONCLUSION

Tucker has failed to state claims of tortious interference with contract and tortious interference with prospective economic advantage and, thus, to the extent that Tucker's UDTPA claim is based on these claims, it likewise fails to state a claim.  Tucker has stated a claim of misappropriation of trade secrets.  As such, Tucker's UDTPA claim survives to the extent it is based on the misappropriation of trade secrets claim.[9]  Finally, Tucker's claim under N.C. Gen. Stat. § 99A-2 also fails.

---

[8] Further, unlike trespass and conversion, N.C. Gen. Stat. § 99A-2 applies to certain acts that, among other things, amount to a breach of an employee's duty of loyalty to an employer.

[9] The UDTPA claim also survives to the extent it is based on Defendants' alleged commercial disparagement, solicitation, and retention of Tucker's property.  *See supra note* 6.

For the reasons outlined herein, the Court enters the following:

<strong>ORDER</strong>

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (ECF No. 32) is GRANTED IN PART AND DENIED IN PART. The Motion to Dismiss is GRANTED with respect to Tucker's tortious interference with contract and prospective economic advantage claims and Tucker's claim under N.C. Gen. Stat. § 99A-2. The Motion to Dismiss is DENIED with respect to Tucker's misappropriation of trade secrets claim and the UDTPA claim based on such misappropriation as stated herein.

This, the 10th day of July, 2017.

        /s/ Loretta C. Biggs
United States District Judge